IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

STACY A. GUNTER                )
                               )
         Plaintiff,            )
                               )
vs.                            )   Case No. 3:17-120-JPG-CJP
                               )
NANCY A. BERRYHILL,            )
Acting Commissioner of Social Security,  )
                               )
         Defendant.[1]         )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Stacy A. Gunter seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in September 2013 alleging an onset date of May 31, 2013. (Tr. 226-35.) Her application was denied initially and again upon reconsideration. (Tr. 109-32, 135-60.) Plaintiff requested a hearing, which Administrative Law Judge (ALJ) Kevin Martin conducted in October 2015. (Tr. 7-11, 33-59.) ALJ Martin issued an unfavorable decision in November 2015. (Tr. 12-32.) The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-6.) Plaintiff exhausted all of her administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

1. The ALJ erroneously found plaintiff did not meet listing 12.05(c).
2. The ALJ improperly evaluated the opinion evidence.

### **Applicable Legal Standards**

To qualify for SSI or DIB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any

3

fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The ALJ's Decision

ALJ Martin followed the five-step analytical framework set forth above. He determined plaintiff met the insured status requirements through March 31, 2018, and had not engaged in substantial gainful activity since May 31, 2013. The ALJ found plaintiff had severe impairments of schizoaffective disorder bipolar type, personality disorder, and borderline intellectual functioning. He further determined plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 17-19.) ALJ Martin opined plaintiff had the RFC to perform a full range of work at all exertional levels but had several non-exertional limitations. (Tr. 20-24.) Plaintiff was unable to perform past relevant work but was not disabled because she could perform other jobs that existed in the national

4

economy. (Tr. 25-26.)

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

In her disability report, plaintiff indicated that schizophrenia, generalized anxiety disorder, borderline personality disorder, headaches, depression, severe allergies, and blackout spells limited her ability to work. (Tr. 247.) She completed two years of college in 1997 and did not attend special education classes. (Tr. 248.) Plaintiff previously worked as a CNA and in-home health care. (Tr. 248.) In a subsequent disability report, plaintiff alleged her depression was worsening. (Tr. 286.)

In her function report, plaintiff stated she experienced anxiety attacks, crying spells, and blackouts when she tried to work. (Tr. 265.) She had double vision and problems with concentration and memory. She found it difficult to understand directions but became too upset to ask for help. (Tr. 270.)

Plaintiff got along with authority figures but they scared her. She was fired several times because she became upset at other people and cried. She handled stress very poorly. She had fears of her mom and dad dying and having to live alone. (Tr. 271.)

Plaintiff fed her two dogs and cat but needed a reminder to do so. Plaintiff's mother helped pick out her clothes and combed her hair. Plaintiff was otherwise able to dress, bathe, care for her hair, shave, feed herself, and use the toilet without assistance. (Tr. 266.) Plaintiff's mother helped with her medication regimen. (Tr. 267.) Plaintiff did not prepare her own meals

because she would forget to turn the stove off. She did some household chores such as drying dishes, dusting, making her bed, and picking up her room. (Tr. 267.) Plaintiff's doctor took her driver's license because she had blackouts and seizures. Plaintiff shopped for food and clothes with her mother. Plaintiff's mother helped plaintiff maintain her checkbook and pay her bills. (Tr. 268.)

Plaintiff's mother completed a third-party function report in November 2013. She stated plaintiff became extremely anxious when she worked and blacked out. Plaintiff required reminders and followed her mother around at home. At work, plaintiff "walk[e]d around like she [was] spaced out." (Tr. 257.) Overall, plaintiff's mother corroborated plaintiff's function report.

2. **Evidentiary Hearing**

ALJ Martin conducted an evidentiary hearing on October 1, 2015, at which plaintiff was represented by counsel. (Tr. 33-59.) Plaintiff's counsel requested a neuro-psych with IQ testing. The ALJ stated he would take the request under advisement. (Tr. 37-38.)

Plaintiff testified she lived with her mother and father. She had a driver's license but her psychiatrist, Dr. Chandra, advised plaintiff not to drive due to her medications. (Tr. 40.) Plaintiff received a two-year Associate of Arts degree, which took her four years to complete. She failed two classes and required several tutors for each class. (Tr. 41, 48-49.) Plaintiff called her parents to pick her up from school once a week because she was scared and wanted to go home. (Tr. 49.) Plaintiff also obtained her CNA license. (Tr. 41.) Plaintiff had not worked or sought employment since May 2013. She last worked as a housekeeper but quit because people were complaining about the way she cleaned. (Tr. 42.)

Plaintiff stated schizophrenia and anxiety attacks limited her ability to work. She had schizophrenia since grade school and experienced anxiety attacks since 2001. Every day

6

plaintiff worked, she became anxious, her heart started pounding, and she cried. She took Paxil, Clonazepam, and Trazadone to control these symptoms. Her medications were effective. (Tr. 43-44.) Plaintiff attended group therapy at Egyptian Health twice a week. She believed her schizophrenia and anxiety were "about the same." (Tr. 45.)

On an average day, plaintiff watched television. She did not cook, and her housework was limited to dusting once a week with her mother's help. Plaintiff also picked up sticks in her yard and fed her dogs and cat. She went shopping at the mall with her mother the afternoon of the hearing. Her hobbies included collecting spoons, reading the Bible, going to the movies, and eating out. She used a computer for Facebook. Plaintiff visited with a friend once each week and attended church. (Tr. 45-47.) Plaintiff did not think she could live alone. (Tr. 48.)

Plaintiff's doctor increased her Latuda because she heard voices, which made it difficult to sleep. She started hearing voices in second grade. Plaintiff also saw people that were not actually there. These hallucinations made it difficult to work. (Tr. 51-52.)

A vocational expert also testified. He opined that an individual with the ultimate RFC finding would not be able to perform plaintiff's past work but could perform other jobs that existed in the national economy. (Tr. 55-56.)

3.  **Medical Records**

Plaintiff presented to the Fairfield Memorial Hospital emergency room on February 24, 2013. Plaintiff's mother stated plaintiff had been "talking out of her head" for two to three days. Plaintiff reportedly had schizophrenia, which was well-controlled, but was talking "very inappropriately" and exhibiting inappropriate behavior. Plaintiff was assessed with acute psychosis and schizophrenia and was prescribed Clonazepam and Haldol. Plaintiff was instructed to follow-up with Dr. Ballard in two to three days. (Tr. 346-58.)

7

On April 25, 2013, plaintiff presented to Nurse Practitioner Kathy Taylor at Community Health Emergency Services for a follow-up regarding her depression. Plaintiff was taking Paxil and Clonazepam, which provided her "great relief." Plaintiff demonstrated an appropriate affect and demeanor. (Tr. 456-59.)

On May 30, 2013, plaintiff was taken by ambulance to Ferrell Hospital after experiencing a seizure at work. A CT of her brain demonstrated no acute pathology. Plaintiff received a note indicating she was unable to work until June 3, 2013. (Tr. 362-76.)

On June 11, 2013, plaintiff presented to Dr. Elizabeth Horton at SMGS Medical Group. Dr. Horton diagnosed plaintiff with alteration of consciousness and developmental disorder. She noted plaintiff had a history of a febrile seizure and an aunt with epilepsy. Brain imaging was normal. Dr. Horton ordered blood tests and an Electroencephalogram (EEG), and advised plaintiff to follow-up in one month. (Tr. 407.)

On June 17, 2013, plaintiff underwent an EEG, which returned normal findings. (Tr. 380-81.) Plaintiff underwent a second EEG on July 10, 2013, which was also essentially normal. (Tr. 382-83.)

Plaintiff attended a follow-up appointment at Community Health Emergency Services on June 6, 2013. Plaintiff reported she experienced seizures six times the previous two weeks. The episodes resulted in an inability to talk, jerking, and seeing double. The nurse practitioner increased plaintiff's Clonazepam and instructed her to remain off work until June 12, 2013. (Tr. 389-91.)

On July 9, 2013, Dr. Horton noted plaintiff had several "events" in a week while at work, but had none since remaining at home. Dr. Horton was "concerned that the stress of the traditional workplace may be too much for [plaintiff] with developmental limitations." (Tr. 405.)

On August 27, 2013, plaintiff presented to Dr. Horton and reported multiple episodes of alteration of consciousness at work. Plaintiff's EEG, blood tests, and imaging were all normal. Plaintiff's mother attended the appointment and stated plaintiff was having difficulty remaining employed. Dr. Horton instructed plaintiff not to drive for six months and follow-up in three months. (Tr. 403.)

### 4. Evaluation and Treatment at Egyptian Health Department

Plaintiff presented to Dr. Rakesh Chandra at Egyptian Health Department in September 2013. She stated she had depression, schizophrenia, and anxiety, and wanted to get disability. Dr. Chandra diagnosed plaintiff with schizophrenia residual type and borderline personality disorder. Plaintiff's global assessment of functioning (GAF) score was fifty-five.[3] Plaintiff was advised to attend individual therapy and CSG and to continue to take Klonopin, Trazadone, and Paxil. (Tr. 496-508.)

Plaintiff reported to Dr. Chandra that she earned an associate's degree. She stated her academic performance history was average. Plaintiff worked for six years at Wabash Christian. She "got into it" with another nurse and was later fired for not putting lids on the trays. She then worked at Ridgway Manor for two years and was fired after pulling a resident backwards in a wheelchair. Plaintiff next worked at Addis for five years and quit because she was not paid enough. Plaintiff also worked at Enfield Nursing Home but was laid off because they had too much help. (Tr. 509.)

Plaintiff was focused and cooperative. She had soft speech, and her recent and remote memory were intact. No perceptual disturbances were noted. Plaintiff's fund of information and

---

[3] A GAF score "is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (5th ed. Text revision 2000)).

thought content were normal. No delusions were noted. (Tr. 510.)

Plaintiff had a psychiatric hospitalization her junior year in high school after experiencing visual and auditory hallucinations. She attempted suicide by cutting her leg and took an overdose of Tylenol. (Tr. 511.)

Dr. Chandra also conducted a Level of Care Utilization System (LOCUS) assessment, which recommended low-intensity community based services.[4] (Tr. 526-27.)

Dr. Chandra noted plaintiff appeared alert and oriented and not severely depressed, suicidal, or psychotic. Plaintiff was able to have a coherent conversation, and her insight and judgment were intact. (Tr. 544.)

On October 24, 2013, plaintiff followed-up with Dr. Chandra. She was alert and oriented, did not appear to be depressed, psychotic, or suicidal, and her insight and judgment were intact. Dr. Chandra prescribed Latuda, Paxil, Klonopin, and Trazodone, and instructed plaintiff to follow up in six to eight weeks. (Tr. 545.)

On December 5, 2013, Dr. Chandra continued plaintiff's medications and advised her to follow-up in three months. (Tr. 552.)

On May 29, 2014, plaintiff reported to Dr. Chandra that she was doing well on her medications with no problems or difficulties. Dr. Chandra continued her medications. (Tr. 551.)

On August 21, 2014 plaintiff followed-up with Dr. Chandra and reported she had been hearing voices and had fleeting thoughts about hurting herself or someone else. On mental status examination, plaintiff was calm and coherent. She appeared to have some delusional thinking and was hallucinating, although she said the voices were much better that day. Dr. Chandra

---

[4] The American Association of Community Psychiatrists developed the LOCUS as a tool for mental health professionals to determine the service and support needs of individuals with mental health challenges. MAINE.GOV, *Level of Care Utilization System (LOCUS) Implementation: Summary and Procedures*, http://www.maine.gov/dhhs/samhs/mentalhealth/mh-system/pasrr/locus/. Plaintiff's score indicated level two care, which is low-intensity community based services. AMERICAN ASSOCIATION OF COMMUNITY PSYCHIATRISTS, LOCUS 21 (March 2009).

increased plaintiff's medications and advised her to follow-up in two weeks. (Tr. 550.)

On September 4, 2014, plaintiff told Dr. Chandra she was doing well on her medicine. She had no difficulties or problems at the time. She was alert and oriented and did not appear severely depressed or psychotic. Her insight and judgment were intact. Dr. Chandra continued plaintiff's Trazadone, Paxil, Klonopin, and Latuda and instructed plaintiff to follow-up in three months. (Tr. 549.)

On October 9, 2014, plaintiff told Dr. Chandra she had not slept for several nights because she did not get all of her Trazadone. Plaintiff was alert and oriented and did not appear severely depressed or psychotic. Her insight and judgment were intact.

On July 2, 2015, plaintiff told Dr. Chandra she was doing well on her medicine. She did not report any problems or difficulties. Dr. Chandra instructed plaintiff to continue her medication and follow-up in three months. (Tr. 546.)

On April 16, 2015, plaintiff told Dr. Chandra she continued to do well on her medicine. She did not report any specific problems or difficulties. Plaintiff was instructed to continue her medications and follow-up in three months. (Tr. 547.)

### 5. Dr. David Warshauer's Letter

In October 2015, Dr. David Warshauer wrote a letter stating he had known plaintiff for several years in a professional capacity. Plaintiff met with Dr. Warshauer on a weekly basis for group therapy. Plaintiff began hearing voices in her late teens and, although she continued to hear voices, she received antipsychotic medications that diminished them. Plaintiff processed information slowly, and her responses were sometimes fairly delayed. She missed the subtleties of many conversation and situations, was very sensitive, had very poor self-esteem and confidence, and did not do well with criticism. The only time plaintiff spent away from her

11

parents was when she ate at a local restaurant with a female friend and the friend's daughter. Dr. Warshauer opined that if plaintiff received Social Security benefits she would need a payee to manage her financial affairs due to her mental illness and cognitive deficits. (Tr. 580-81.)

### 6. Dr. William Donaldson's Report

Dr. William Donaldson completed a psychological report on October 14, 2015, which included a Wechsler Adult Intelligence Scale (WAIS) IV assessment.[5] Plaintiff was cooperative and put forth a concerted effort. Dr. Donaldson opined the test results were a reliable indicator of plaintiff's cognitive functioning ability. Plaintiff's WAIS IV results were as follows:

- Verbal Comprehension: 72
- Perceptual Reasoning: 63
- Working Memory: 71
- Processing Speed: 56
- Full Scale: 70
- General Ability: 64

Dr. Donaldson noted plaintiff was diagnosed and receiving treatment for psychosis NOS, depression, and anxiety. Plaintiff scored in the ninth percentile on the Verbal Comprehension Domain and in the second percentile on the Processing Speed Domain. The results indicated plaintiff functioned in the mild range of intellectual disability and that the developmental delay was prior to age twenty-one. Plaintiff's test results indicated a Full Scale IQ of seventy. Dr. Donaldson noted plaintiff's personal appearance and social and verbal skills masked her cognitive disabilities. He opined plaintiff met the clinical criteria for disability benefits. (Tr. 582-83.)

Dr. Donaldson administered another WAIS IV on October 15, 2015, with the following results:

---

[5] The WAIS is "[a]n intelligence scale based on verbal and performance material which takes into consideration the age of the subject." J.E. SCHMIDT, ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER (Matthew Bender 2017).

- Verbal Comprehension: 80
- Perceptual Reasoning: 75
- Working Memory: 71
- Processing Speed: 68
- Full Scale: 70
- General Ability: 75

(Tr. 584-85.)

### 7. State-Agency Consultant Opinions

On November 27, 2013, Dr. Howard Tin conducted a Mental RFC assessment (MRFCA) and concluded plaintiff was moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 116-17.)

Dr. M. W. DiFonso also completed an MRFCA on June 11, 2014, and concurred with Dr. Tin's assessment. (Tr. 143-44.)

## **Analysis**

Plaintiff first asserts the ALJ erred in finding she did not meet listing 12.05(C), which relates to persons with mental retardation. To meet this listing, a claimant must establish "(1) deficits in adaptive functioning before age 22, (2) a valid IQ score of 60 through 70, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Charette v. Astrue*. 508 F. App'x 551, 553 (7th Cir. 2013) (internal quotations omitted); *see* 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05(C).

In the present case, plaintiff specifically contests the ALJ's finding that she did not have deficits in adaptive functioning. The Seventh Circuit Court of Appeals has defined "deficits in adaptive functioning" as the "inability to cope with the challenges of ordinary everyday life."

13

*Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). There is no requirement that an ALJ use "a specific measurement method" to determine whether the claimant manifested a deficit in adaptive functioning before age twenty-two. *Charette*, 508 F. App'x at 553.

In reaching his decision, ALJ Martin noted plaintiff was able to complete high school, was not in special education classes, and earned a two-year associate's degree; plaintiff worked full-time above substantial gainful activity levels from 1999 to 2007; and plaintiff obtained a driver's license and drove throughout most of her adulthood. (Tr. 20.)

Plaintiff argues the ALJ erroneously ignored and mischaracterized evidence. An ALJ must consider all of the evidence and cannot cherry-pick portions of the record that support a finding of non-disability while ignoring evidence that suggests disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Particularly, plaintiff states the ALJ did not acknowledge she lived her entire life with her parents, did not think she could live by herself, needed assistance with daily activities, took four years to complete a two-year degree with the assistance of tutors, and was fired from several jobs.

At Step 3, the ALJ dedicated several paragraphs to summarizing plaintiff's reported limitations in daily functioning, including plaintiff's testimony she lived with her parents and depended on her mother's assistance.[6] As plaintiff points out, the ALJ did not mention she was fired from some of her jobs, took four years to complete a degree, or needed the assistance of tutors. However, this does not constitute "cherry-picking." The ALJ did not ignore an entire line of evidence contrary to his ruling or mischaracterize the evidence. ALJ Martin recognized plaintiff's complaints that she had difficulties at work and experienced impairments in

---

[6] It is proper to read the ALJ's decision as a whole and it would be a needless formality to repeat similar analyses at multiple steps. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

memorizing, concentrating, and understanding. (Tr. 21.) An ALJ is not required to mention every piece of evidence so long as he builds a logical bridge between the evidence and his conclusion, *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2016), which ALJ Martin did here. *See Charette*, 508 F. App'x at 554 (upholding the ALJ's determination plaintiff did not have deficits in adaptive functioning where the claimant could manage household chores, take care of his pets, and socialize with others).

Additionally, virtually all of the evidence plaintiff set forth attests to her condition past the age of twenty-two. The record contains minimal evidence concerning plaintiff's cognitive state before she reached this age. A represented claimant "is presumed to have made [her] best case before the ALJ," *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007), and a claimant bears the burden of establishing she meets the requirements of a listing at Step 2, *Filus v. Astrue*, 694 F.3d, 863, 868 (7th Cir. 2012). Plaintiff cannot fault the ALJ for her own failure to support her claim. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

For the foregoing reasons, substantial evidence supports the ALJ's determination plaintiff did not meet listing 12.05(C).

Plaintiff next asserts the ALJ improperly weighed the opinion evidence in the record.

Plaintiff consulted Dr. Donaldson in October 2015 to obtain a psychological report. Dr. Donaldson opined, "It would [sic] this author's opinion that Ms. Gunter's primary diagnosis is Mild Intellectual Disability and that the onset of developmental delay was prior to age 21." (Tr. 583.)

Dr. Donaldson falls within the definition of a non-treating source, which is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." *Simila*, 573 F.3d at 514. The record

15

indicates Dr. Donaldson examined plaintiff, at most, twice, and nothing in the record demonstrates an ongoing relationship. Moreover, plaintiff's relationship with Dr. Donaldson was "not based on [her] medical need for treatment or evaluation, but solely on [her] need to obtain a report in support of [her] claim for disability." *Id.*

An ALJ is required to determine the weight to assign a non-treating source's opinion by examining supportability, consistency, and other factors set forth in 20 C.F.R. § 404.1527. *Simila*, 573 F.3d at 515. In making this determination, the ALJ is only required to "minimally articulate[] his reasons." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

ALJ Martin did exactly this in assigning Dr. Donaldson's report little weight. The ALJ noted the report was inconsistent with plaintiff working, driving, and obtaining an associate's degree and her CNA. (Tr. 20.) "[T]he administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence – *which need not itself be medical in nature*. . . ." *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (emphasis added). The ALJ's decision to discount Dr. Donaldson's opinion was supported by substantial evidence.

Finally, plaintiff contends the ALJ improperly substituted his own opinion for that of a medical expert. The cases in which the Seventh Circuit Court of Appeals has reversed an ALJ for "playing doctor" "are ones in which the ALJ failed to address relevant evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Plaintiff does not point to any evidence the ALJ ignored, and "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt*, 496 F.3d at 845. Accordingly, this argument fails as well.

For the reasons discussed above, substantial evidence supports the ALJ's opinion.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE: November 21, 2017**

                                          s/ J. Phil Gilbert
                                          **J. PHIL GILBERT**
                                          **DISTRICT JUDGE**